**ORIGINAL**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X DLB/3276
SANDRA LOCHREN, SARAH A. MACDERMOTT,
PATRICIA O'BRIEN, KELLY MENNELLA,
CHRISTINE BLAUVELT, and MIRIAM RIERA,

Plaintiff,

-against-

COUNTY OF SUFFOLK and
SUFFOLK COUNTY POLICE DEPARTMENT

Defendants.
-----------------------------------------------------------------X

**F I L E D**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★   AUG 02 2004   ★

LONG ISLAND OFFICE

Civil Action No. CV-01-3925
(Hon. Leonard Wexler)

---

### MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT

---

**CHRISTINE MALAFI**
**Suffolk County Attorney**
**By: Diane Leonardo Beckmann**
**Assistant County Attorney**
**Attorney for Defendants**
**H. Lee Dennison Bldg.**
**P.O. Box 6100**
**100 Veterans Memorial Highway**
**Hauppauge, New York 11788-0099**
**(631) 853-4049**

# **TABLE OF CONTENTS**

Page

Table of Authorities……………………………………………………… i

Preliminary Statement……………………………………………………… 1

Statement of Facts…….…………………………………………… ……. 1

POINT I

      THE PLAINTIFFS FAIL TO SET
      FORTH A PRIMA FACIE CASE
      UNDER TITLE VII…………….. ………………………………… …10

POINT II

      PLAINTIFFS FAILED TO
      ESTABLISH A PRIMA FACIE
      CASE OF PDA DISCRIMINATION…………………………..…23

POINT III

      THE COURT LACKS
      JURISDICTION OVER ISSUES
      NOT RAISED BEFORE THE EEOC…………………………………...24

POINT IV

      PLAINTIFFS STATE CLAIMS
      MUST BE DISMISSED FOR FAILURE
      TO SERVE A NOTICE OF CLAIM …………………………………….24

## TABLE OF AUTHORITIES

### FEDERAL CASES

Brown v. Coach Stores, Inc.,
    163 F.3d 706 (2d Cir. 1998) ........................................................................... 19

Butts v. City of New York Dep't of Hous. Pres. and Dev.,
    990 F.2d 1397 (2d Cir. 1993) ......................................................................... 24

Carney v. Martin Luther Home. Inc.,
    824 F.2d 643 (8th Cir. 1987) .......................................................................... 23

Celotex Corp. v. Catrett,
    477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ............................... 10

Cruz v. Coach Stores, Inc.,
    202 F.3d 560 (2d Cir. 2000) ........................................................................... 19

Geier v. Medtronic, Inc.,
    99 F.3d 238 (7th Cir. 1996) ............................................................................ 23

Graham v. Long Island R.R.,
    230 F.3d 34 (2d Cir. 2000) ............................................................................. 11

Holtz v. Rockefeller & Co.,
    258 F.3d 62 (2d Cir. 2001) ............................................................................. 24

Horton v. Am. Railcar Indus.,
    214 F.Supp. 2d 921 ( Dist.Ct. Ark. 2002) ..................................................... 23

Lang v. Star Herald,
    107 F.3d 1308 (8th Cir. 1997) ....................................................................... 20

Oncale v. Sundowner Offshore Services, Inc.,
    523 U.S. 75, 118 S.Ct. 998, 140 L.Ed 2d 201 (1998) ................................. 10

Piraino v. International Orientation Resources, Inc.,
    84 F.3d 270 (7th Cir. 1996) ............................................................................ 20

Pollis v. New Sch. for Soc. Research,
    132 F. 2d 115 (2d Cir. 1997) .......................................................................... 21

Pustilnik v. Hynes,
2000 U.S. Dist. LEXIS 8718, 2000 WL 914629 (E.D.N.Y. June 27, 2000) .............. 24

Slattery v. Swiss Reinsurance America Corp.,
248 F.3d 87 (2d Cir.), cert. denied, 534 U.S. 951, 151 L. Ed. 2d 263, 122 S.
Ct. 348 (2001) ........................................................................................................... 19

Spivey v. Beverly Enterprises, Inc.,
196 F. 3d 1309 (11th Cir. 1999)................................................................................. 23

Tarshis v. The Riese Organization,
211 F.3d 30 (2d Cir. 2000)........................................................................................ 11

Tomka v. Seiler Corp.,
66 F. 3d 1295 (2d Cir. 1995)..................................................................................... 10

Urbano v. Continental Airlines, Inc.,
138 F.3d 204 (5th Cir. 1998)..................................................................................... 20

## STATE CASES

Mills v. County of Monroe,
59 N.Y.2d 307, 464 N.Y.S.2d 709, 451 N.E.2d 456 (1983) ....................................... 24

## STATUTES

42 U.S.C. §2000 et. seq. .………..................................................................................... 1

Fed.R.Civ.P. 56(c)........................................................................................................... 9

N.Y. County Law §52 ..................................................................................................... 25

Fed. Rule of Civ. Procedure 56 ....................................................................................... 1

## PRELIMINARY STATEMENT

The Plaintiffs, Sandra Lochren, Sarah MacDermott, Patricia O'Brien, Kelly Mennella, Christine Blauvelt, and Miriam Riera (hereinafter referred to as the "Plaintiffs," except where referred to individually by context) claim that the County of Suffolk and the Suffolk County Police Department (hereinafter referred to collectively as the "Department") discriminated against them under 42 U.S.C. §2000 ("Title VII") as amended by the Pregnancy Discrimination Act ("PDA") and the New York State Executive Law, §296 and 297. (See, Exhibit "A," Second Amended Complaint).[1]

The Department submits this memorandum of law in support of its motion for summary judgment pursuant to Fed. Rule of Civ. Procedure 56.

## STATEMENT OF FACTS

On April 11, 2000, the Department issued order number 00-10 stating that:

> "Effective 0001 hours, April 12, 2000, no sworn officer will be placed on 301,   Limited Duty status."

(Exhibit "B"). This order was clarified by order number 00-10A, issued on April 13, 2000 and stating:

> This is to clarify Special Order 00-10.
> Effective 0001, April 12, 2000, any sworn officer who suffers an off duty injury, condition or illness that prevents him or her from performing full police duties will not be allowed to work until such time as said officer is able to perform full police duties. Absences resulting from the inability to perform full police duties as a result of an illness, condition or off duty injury will be coded, for attendance purposes, "301".

(Exhibit "C").

The Department allowed officers who were currently on 301, Limited Duty

---

[1] Exhibits referenced herein are attached to the declaration of Diane Leonardo Beckmann, dated July 6, 2004.

status to remain on that status for a period of time.  This was known as being "grandfathered-in." (Exhibit "D," Webber Deposition, page 105).  This period of "grandfathering in" ended in February 2001 when the Department sent letters to all officers still on the 301 limited duty status.  (See, for e.g. Exhibit "E" Letter to P.O. Theresa Brodtman).  In sum and substance, officers were advised that if they were unable to perform their full duties, they had to absent themselves from work and use their accruals.  "Full duty" basically means the ability carry a weapon and make arrests.  (Exhibit "D," Webber Deposition, page 48).  A full-duty desk officer is someone who has to be "able to respond at any given time to the changing demands for service.  The changing demands for service could require them to go out, get in a patrol car, assist with an arrest...they are, in essence, full duty, at risk police officers."  (Exhibit "F,"  Rau Deposition, page 103).

**Plaintiff Sandra Lochren**

Lochren has been employed by the Department as a police officer since 1993.  (Exhibit "A", Second Amended Complaint, ¶7).  Lochren's children were born on December 15, 2000 and July 27, 1997 while Lochren was employed as a Suffolk County Police Officer. (Exhibit "G," Lochren Deposition, pages 9, 11).  Lochren is married to a Suffolk County Police officer, Steven Dunne.  (Exhibit "G," Lochren Deposition, page 5).

Lochren requested and was granted a transfer to the DARE Unit in 1996. (Exhibit "G," Lochren Deposition, page 18). Lochren alleges that she requested a transfer to Research and Development in April or May of 2000, was interviewed, but did not get the position.  (Exhibit "G," Lochren Deposition, page 49-50).  Lochren did not request any other transfers.  (Exhibit "G," Lochren Deposition, page 51).  Lochren took the sergeant's exam one time, in 1997, and did not score well enough to be on the list of the top 120 officers.  (Exhibit "G," Lochren

Deposition, page 53-54).   Lochren stated that her ability to be promoted was not affected by the time she took off due to pregnancy and childbirth.  (Exhibit "G," Lochren Deposition, page 54). Lochren stated that her ability to be transferred was not affected by the time she took off due to pregnancy and childbirth because she did not take any promotional exams.  (Exhibit "G," Lochren Deposition, page 55).

Lochren was unable to name any officers that were passed over for a transfer due to the use of excessive sick time.  (Exhibit "G," Lochren Deposition, page 55).  Lochren testified that Officers Sammarco, Vanderhyde, Macholz-Barr and Bless suffered from non-line of duty injuries or illnesses and worked the desk at the Sixth Precinct prior to the change in policy. (Exhibit "G," Lochren Deposition, page 60-61).  Subsequent to the change in policy, these officers were required to go back on the road. (Exhibit "G," Lochren Deposition, page 62).

Subsequent to the change in policy, Lochren was unaware of any officers that had a non-line of duty injury or illness that were placed on desk duty.  (Exhibit "G," Lochren Deposition, page 63).   Lochren was transferred to the Sixth Precinct as part of a disciplinary proceeding. (Exhibit "G," Lochren Deposition, page 67).

Lochren, after notifying the Department that she was pregnant, was given the option of going home or returning to patrol.  (Exhibit "G," Lochren Deposition, page 73).  Lochren was on a leave of absence from June 21, 2000 through September 6, 2001, a period of approximately 15 months.  (Exhibit "G," Lochren Deposition, page 83).  Lochren, McDermott and O'Brien filed a grievance with the PBA over the change in policy, went to arbitration and lost the arbitration.  (Exhibit "G," Lochren Deposition, page 41; Exhibit "H," Arbitration Decision, dated April 5, 2002).

Lochren claimed that her seniority was affected by her unpaid leave of absence in terms of "when they look at your chart, will you get that transfer due to your sick time." (Exhibit "G," Lochren Deposition, page 85). Lochren also stated that her ability to be promoted was not affected by the time she took off due to pregnancy and childbirth. (Exhibit "G," Lochren Deposition, page 54).

Lochren claimed that her longevity within the New York State Retirement System was affected by a leave of absence because she'll "have to put in extra time at the end of her career." (Exhibit "G," Lochren Deposition, page 86). Lochren was unable to name any specific male officers that were given accommodations for non-line of duty injuries after the change in policy. (Exhibit "G," Lochren Deposition, page 88).

**Plaintiff Sarah MacDermott (formerly Arroyo)**

MacDermott entered the Department's Police Academy on February 13, 1989. (Exhibit "I," MacDermott Deposition, page 12-13). MacDermott is married to a Suffolk County Police Officer. (Exhibit "I," MacDermott Deposition, page 7-8). MacDermott's children were born on October 27, 1997 and May 8, 2002. (Exhibit "I," MacDermott Deposition, page 12). MacDermott was transferred to data services in 1998 or 1999. (Exhibit "I," MacDermott Deposition, page 22). MacDermott requested, but did not receive a transfer to Narcotics in 1998 or 1999. (Exhibit "I," MacDermott Deposition, page 24-25). MacDermott believed that she was not promoted to Narcotics because she used a significant amount of sick days. (Exhibit "I," MacDermott Deposition, page 32).

MacDermott requested a transfer in September 2001 to a different squad and that transfer was approved. (Exhibit "I," MacDermott Deposition, page 28- 29). In August of 2002,

MacDermott requested a transfer to a different squad due to child care issues and that transfer
was approved. (Exhibit "I," MacDermott Deposition, page 29-30).

MacDermott has never taken a civil service exam for promotion. (Exhibit "I,"
MacDermott Deposition, page 30). MacDermott stated that her ability to take a promotional
examination has not been impaired by maternity leave. (Exhibit "I," MacDermott Deposition,
page 30). MacDermott stated that her ability to be promoted has not been affected by the time
that she took off due to maternity leave or pregnancies. (Exhibit "I," MacDermott Deposition,
page 31).

MacDermott named Officers Chuichiolo and DeGeronimo as two officers who she
claimed were assigned to administrative function or desk duty for a non-line of duty injury
occurring after the April 2000 change in policy. (Exhibit "I," MacDermott Deposition, page 93).
MacDermott's medical insurance did not lapse during the time she was out of accruals.
(MacDermott Deposition, page 101-102).

**Plaintiff Patricia O'Brien (formerly known as Patricia Garden):**

O'Brien is married to a Suffolk County Police Officer (Exhibit "J," O'Brien Deposition,
page 9). O'Brien has five children: twins born on May 22, 1997, a child born on December 22,
2000 and twins born on August 23, 2002. (Exhibit "J," O'Brien Deposition, pages 11-12).
O'Brien was a cadet when her children were born on May 22, 1997. (Exhibit "J," O'Brien
Deposition, page 11). O'Brien was appointed as a Police Officer in November 1998. (Exhibit
"J," O'Brien Deposition, page 27). O'Brien previously was part of a cadet program within the
Department beginning in September 1994. (Exhibit "J," O'Brien Deposition, page 17-18).
While assigned to the Sixth Precinct, O'Brien never applied for a transfer. (Exhibit "J,"
O'Brien Deposition, page 36). O'Brien has never applied for a promotion. (Exhibit "J,"

O'Brien Deposition, page 36-37). O'Brien took the civil service exam for sergeant in June 2003 and scored a grade of 64. (Exhibit "J," O'Brien Deposition, page 37).

O'Brien has never applied for a promotion or transfer. (Exhibit "J," O'Brien Deposition, page 39). O'Brien was unaware of any officers that were denied a transfer because of the use of a maternity leave. (Exhibit "J," O'Brien Deposition, page 39). O'Brien was unaware of any officer with a non-line of duty injury that was granted light duty status after the change in policy. (Exhibit "J," O'Brien Deposition, page 53).

**Plaintiff Christine Blauvelt (formerly known as Weixler)**

Blauvelt's children were born on March 4, 1999 and May 30, 2002. (Exhibit "K," Blauvelt Deposition, page 6-7). Blauvelt was appointed a Suffolk County Police Officer on March 29, 1993. (Exhibit "K," Blauvelt Deposition, page 9). Blauvelt applied for a transfer to the Applicant Investigation Section in April of 2003. (Exhibit "K," Blauvelt Deposition, page 16). Blauvelt was unable to state that she did not receive the transfer to Applicant Investigations due to her maternity leave. (Exhibit "K," Blauvelt Deposition, page 21). Blauvelt did not apply for any other promotions or transfers. (Exhibit "K," Blauvelt Deposition, page 21).

Blauvelt claimed that she was advised by an unknown person that Officer Messina was allowed to work in the police annex due to a non-line of duty illness but she was unable to stated how long he was assigned there. (Exhibit "K," Blauvelt Deposition, page 31). Blauvelt took a leave of absence for the period December 24, 2001 through November 19, 2002, almost eleven months, and received her full salary. (Exhibit "K," Blauvelt Deposition, page 47-48). Blauvelt took 110 sick days, 20 vacation days, four compensatory days and one "X" day for her first pregnancy in 1999. (Exhibit "K," Blauvelt Deposition, page 38-39). Blauvelt did not take

to pregnancy on January 10, 2004 when she was thirty-six weeks pregnant. (Exhibit "L," Riera Deposition, page 45). Riera remained on patrol until the beginning of December 2003. (Exhibit "L," Riera Deposition, page 47). Riera was assigned to the desk at the Second Precinct due to two officers going back on the road. (Exhibit "L," Riera Deposition, page 48). While on the desk assignment, Riera went out on patrol in a sector car. (Exhibit "L," Riera Deposition, page 49). From January 10, 2004 to April 20, 2004, Riera used her accruals. (Exhibit "L," Riera Deposition, page 49).

Riera was unable to name, and further had no knowledge of, any officers that were injured off the job and were given a light duty or modified assignment as alleged in the Amended Complaint. (Exhibit "L," Riera Deposition, page 51-52). Riera was unable to name any similarly situated male officers that were given a light duty or modified assignment. (Exhibit "L," Riera Deposition, page 55).

**Plaintiff Kelly Mennella**

Mennella is married to a Suffolk County Police Officer. (Exhibit "M," Mennella Deposition, page 5). Mennella's children were born on April 23, 2001 and January 30, 2004. (Exhibit "M," Mennella Deposition, pages 7-8). Mennella was appointed as a police officer in May 1995. (Exhibit "M," Mennella Deposition, page 10). Mennella applied for a transfer to Narcotics in November of 2000 and did not get that position. (Exhibit "M," Mennella Deposition, page 17). Mennella was unable to state the name of the officer that received that position or why Mennella herself did not receive that position. (Exhibit "M," Mennella Deposition, page 19-20).

Mennella applied for a position with a new unit at MacArthur Airport in November 2001. (Exhibit "M," Mennella Deposition, page 20). Mennella was unable to name the officers

that were selected for that unit or the name of the commanding officer. (Exhibit "M," Mennella Deposition, page 21). Mennella then requested a transfer to patrol in the Fourth Precinct in January 2002. (Exhibit "M," Mennella Deposition, page 21-22). Mennella retracted her request to transfer to the Fourth Precinct. (Exhibit "M," Mennella Deposition, page 25). Mennella was granted a midnight tour at the Sixth Precinct upon her request. (Exhibit "M," Mennella Deposition, page 25). Mennella took the civil service examination for Sergeant in June 2003, but did not pass the test. (Exhibit "M," Mennella Deposition, page 26-27).

Mennella was unable to state that her ability to transfer was affected by the amount of maternity leave that she took. (Exhibit "M," Mennella Deposition, page 27). As Mennella pointed out, one transfer request that she did not receive occurred prior to her maternity leave. (Exhibit "M," Mennella Deposition, page 27).

Mennella claimed that Officer Sammarco was accommodated with a non-line of duty injury, but that his accommodation occurred prior to the change in policy. (Exhibit "M," Mennella Deposition, page 66). Mennella also stated that pregnant officers were "grandfathered-in" for a time. (Exhibit "M," Mennella Deposition, page 66-67). Mennella was unable to name any officers that were given a light duty position for a non-line of duty injury occurring after the change in policy in April 2000. (Exhibit "M," Mennella Deposition, page 67-68).

## ARGUMENT

Summary judgment is authorized when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of

summary judgment, after adequate time for discovery and upon motion, against a party who fails

to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett,

477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, (1986).

**POINT I**

**THE PLAINTIFFS FAIL TO
SET FORTH A PRIMA FACIE
CASE UNDER TITLE VII.**

"The critical issue, Title VII's text indicates, is whether members of one sex are exposed

to disadvantageous terms or conditions of employment to which members of the other sex are

not exposed." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80, 118 S.Ct. 998,

1002, 140 L.Ed 2d 201 (1998) (internal quotation marks omitted) (citing Harris v. Forklift

Systems, Inc., 510 U.S. 17, 114 S. Ct. 367, 126 L.Ed. 2d 295 (1993).

This memorandum will address a Title VII analysis only as the same standard of proof

applies for claims brought under Title VII and the New York State Human Rights Law. Tomka

v. Seiler Corp. 66 F. 3d 1295, 1323 (2d Cir. 1995).  The plaintiffs have not shown that they were

subjected to any disadvantageous terms or conditions of employment as compared to male

officers.

In April of 2000, the Police Department adopted a policy stating that all officers

suffering from an off duty injury, condition or illness that prevents him or her from performing

full police duties will not be allowed to work until such time as the officer is able to perform full

police duties.  (See, Exhibit "B" and Exhibit "C").

The policy changed in that "...we were no longer going to allow people back to work

light duty.  We were going to keep them out if they were unable to perform their function in the

10

full duty capacity." (Exhibit "D," Webber Deposition, page 48). Chief Webber testified that a committee was formed in early 2000 to address light duty concerns (Exhibit "D," Webber Deposition, page 11).

"...[I]n order to establish a Title VII prima facie case, a plaintiff must show four elements...namely that he is (1) a member of the protected class, (2) qualified for and satisfactorily performing his job, (3) subjected to an adverse employment decision, and that (4) this adverse decision occurred under circumstances giving rise to an inference of discrimination." Tarshis v. The Riese Organization, 211 F.3d 30, 36 (2d Cir. 2000)(citations omitted). The plaintiffs cannot show that they were qualified for the job, that they were subjected to an adverse employment action and that any adverse decision occurred under circumstances giving rise to an inference of discrimination.

## A. CIRCUMSTANCES GIVING RISE TO INFERENCE OF DISCRIMINATION

### I.      DISPARATE TREATMENT

"A plaintiff may raise such an inference [of discrimination] by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." Graham v. Long Island R.R., 230 F.3d 34, 38-39 (2d Cir. 2000). The plaintiffs allege that they were subjected to disparate treatment under Title VII. The plaintiffs, however, failed to raise this issue before the EEOC as discussed more fully in **Point III** below.   For purposes of this argument, however, this memorandum will address an analysis of disparate treatment and disparate impact under Title VII

Essentially, the plaintiffs seek to compare themselves with three distinct groups of officers:  1) officers that are injured in the line of duty; 2) officers who have had their guns taken away for disciplinary reasons and 3) officers who suffer from an off-duty injury or illness.

The Department maintains codes for attendance purposes. Officers injured in the line of duty are coded "401" for attendance purposes.

> " 301 is an attendance code that was arbitrarily chosen by the department for the basis of deducting sick days. And that's what 301 is. Limited duty would be that an officer was allowed to work because of a condition that existed through no connection to the police function itself."

(Exhibit "N," Robilotto Deposition, page 176).

Previously, this permission to work was non-contractual and for the convenience of the officers themselves. Rather than use sick time or vacation time, an officer injured off duty was permitted to work and continue to accrue sick time benefits.

By its plain meaning, a non-line of duty injury is readily distinguishable from a line of duty injury. A line of duty injury differs in that under General Municipal Law, §207-c, the Department must pay an officer's full salary if the officer is injured in the line of duty.  For attendance purposes within the Department 401 is an "injury incurred in the line of duty."  (See, Exhibit "O" Gallagher Deposition. page 39). 401, line of duty and 301, non line of duty, are two "discrete statuses."  (See, Exhibit "O" Gallagher Deposition. page 64). "...207-c allows us to bring people in on light duty, because we are paying them full duty.  And we are allowed to utilize them to the capacity they're able to work." (Exhibit "D", Webber Deposition, page 47). If an officer is injured in the line of duty, the Police Department **must** pay that officer's full salary under General Municipal Law, §207-c provides, in relevant part:

> Payment of salary, wages, medical and hospital expenses of policemen with injuries or illness incurred in the performance of duties
> 1. ...any member of a police force of any county... shall be paid by the municipality by which he is employed the full amount of his regular salary or wages until his disability arising therefrom has ceased...
> 3.    If such a policeman is not eligible for or is not granted such accidental disability retirement allowance or retirement for disability incurred in performance of duty allowance or similar accidental disability pension and is nevertheless, in the opinion of such health authorities or physician, unable to perform his regular duties as a result of such injury or sickness but is

able, in their opinion, to perform specified types of light police duty, payment of the full amount of regular salary or wages, as provided by subdivision one of this section, shall be discontinued with respect to such policeman if he shall refuse to perform such light police duty if the same is available and offered to him, provided, however, that such **light duty** shall be consistent with his status as a policeman and shall enable him to continue to be entitled to his regular salary or wages, including increases thereof and fringe benefits, to which he would have been entitled if he were able to perform his regular duties.

While the plaintiffs collectively complain that only officers with a line of duty injury are allowed to work the desk or a light duty assignment, Mennella herself fell into that category.  In September 2000, Mennella sprained her right elbow in the line of duty and was permitted by her doctors to only work a light duty assignment, which she did from September 2000 until January 5, 2001.  (See, Exhibit "A," Second Amended Complaint, ¶116).  As explained by Chief Webber, the Department is allowed to have an officer injured in the line of duty work up to their capabilities because the Department is required to pay their full salary under 207-c.  (See, Exhibit "D", Webber Deposition, page 47). The Department's treatment of line of duty injuries and non-line of duties injuries has been consistent.  There is no unequal application of these procedures

In sum, the County is required to pay the full salary of an officer injured in the line of duty and the officer, in turn, is required to perform a light duty assignment to continue receiving his full salary.  These are statutory obligations that **must** be fulfilled by both the County and the individual officer injured in the line of duty.  Previously, allowing an officer injured off the job to report to work was a non-contractual, non-statutory convenience for the officers involved.  Accordingly, officers injured off-duty are not similarly situated in any respect to officers injured on-duty.

Plaintiffs also compare themselves to officers that had their guns taken away for disciplinary reasons.  (Exhibit "A," Second Amended Complaint, ¶¶48, 49).  Quite simply, there

13

is no comparison and no similar situation between an officer who is facing disciplinary action and an officer who suffers a non-line of duty injury or illness. In addition, to be similarly situated, the plaintiffs must show that they were similarly situated in all material respects. "If [the gun] is taken by the department and because of the color or scheme of law, the department doesn't have the ability to immediately terminate that officer. If we have been advised that we would be in violation of the work laws by not allowing them to work, then we put them in a place where while they have no gun, they can't do anything in contact with the public without a supervisor being directly available." (See, Exhibit "N," Robilotto Deposition, page 117).

Plaintiffs claim that the "defendants violated their own policy and allowed officers with non-pregnancy related conditions occurred off the job after April 2000 to work at light duty assignments after the change in policy." (See, Exhibit "A," Second Amended Complaint, ¶46). Plaintiffs, however, during the course of discovery, identified only two officers that were allowed to work a light duty assignment by their respective supervisors. MacDermott identified Officers Chiuchiolo and DeGerolemo as receiving a light duty assignment after the policy change. (Exhibit "I," MacDermott Deposition, page 93).

The Department, however, through Chief Robilotto advised supervisors that if they, the supervisors, did not adhere to the new policy that "their own assignment would be jeopardized." (See, Exhibit "N," Robilotto Deposition, page 281-282). Furthermore, when the Department became aware of two lieutenants who violated this new policy, those two lieutenants were disciplined. (See, Exhibit "N", Robilotto Deposition, page 283; Exhibit "P" Feil Deposition, page 79).

Officer Chiuchiolo, with a minor physical malady, was permitted to work the desk by Lieutenant Eller. (See, Exhibit "P," Feil Deposition, page 77-78). Officer DeGerolemo was

also permitted to work the desk for two days with an off-duty injury by Lieutenant Kelly.  (See, Exhibit "P," Feil Deposition, page 78).  Upon investigation by the Internal Affairs Bureau, these two lieutenants were disciplined. (See, Exhibit "Q" Disciplines).  Accordingly, upon the Department's discovery that two lieutenant's violated the policy, disciplinary action was taken by the Department.

Mennella, Riera, O'Brien and Lochren were unable to name any officers that were given a light duty position for a non-line of duty injury occurring after the change in policy in April 2000. (See, Exhibit "M," Mennella Deposition, page 67-68; Exhibit "L," Riera Deposition, page 51-52; Exhibit "J," O'Brien Deposition, page 53; and Exhibit  "G," Lochren Deposition, page 88). Blauvelt had no personal knowledge of any officer assigned to light duty with a non-line of duty injury after April 2000.  (Exhibit "K," Blauvelt Deposition, page 31).

Accordingly, the plaintiffs have not shown that they were subjected to any disparate treatment.

## II.    Adverse employment actions

Plaintiffs are unable to establish that they were subjected to any adverse employment actions as a result of what they claim is a discriminatory policy change. Plaintiffs claim: that they are being required by the Department to exhaust all accruals by using all their sick, vacation and compensatory time; that since they are being forced to go on leave, they do not "accrue seniority and longevity time;" that sick leave is considered by the Department when an officer is applying for promotion or transfer and thus, a female officer's "advancement and mobility within the Department is hindered". (See, Exhibit "A," Second Amended Complaint, ¶¶ 57, 58, 60).

Plaintiffs also claim that the Department previously had allowed officers to donate leave time to other officers. (See, Exhibit "A," Second Amended Complaint, ¶62). This assertion is completely without merit as the Department of Labor Relations determines when leave time may be donated and O'Brien, while pregnant was allowed to use her husband's accruals in 2002 due to her claim that she was having a "difficult" pregnancy. (See, Exhibit "R" Leave time donations). These leave time agreements between the individual officer and Labor Relations also expressly state that these are non-precedent setting, considered on a case by case basis, and are not for use in any court proceeding. It is disingenuous for O'Brien to suggest that these agreements are utilized to the detriment of women officers when she has been the beneficiary of such an agreement in the year 2002. There have been other pregnant officers who were allowed donations from their respective husbands. (See, Exhibit "S"). In any event, pregnant officers have not been treated differently than male officers with respect to leave time donations.

The plaintiffs claim that they have only taken an unpaid leave in response to the Department's change in policy. O'Brien claims that the new policy discriminates against female police officers because she used her accruals and now has fewer days "on the books" than her husband. (Exhibit "J," O'Brien Deposition, page 88-89). O'Brien had twins on May 22, 1997 **prior** to the change in policy and exhausted all her accruals. (See, Exhibit "T" O'Brien Time Sheets). O'Brien specifically requested an unpaid leave in 1997 of 122 days. After using her accruals, O'Brien was permitted to use her husband's accruals and then O'Brien went on unpaid leave. (Exhibit "J," O'Brien Deposition, pages 13-14).

MacDermott took sick time leave of 98 days in 1997, **before** the change in policy. (See, Exhibit "U" MacDermott Time Sheets). Although MacDermott believed that she was not promoted to Narcotics because she used a significant amount of sick days, (Exhibit "I,"

MacDermott Deposition, page 32), MacDermott's use of sick days in 1997 was at her own discretion and not the result of the Department's change in policy.   Although MacDermott did not get the transfer to Narcotics, she did get transfers at her request, including a transfer to help her with child care issues. (Exhibit "I," MacDermott Deposition, page 29-30).

Blauvelt testified that she took leave of 110 sick days, 20 vacation days, four compensatory days and one "X" day for her first pregnancy in 1999, prior to the change in policy. (Exhibit "K," Blauvelt Deposition, page 38-39; Exhibit "V," Blauvelt Time Sheets). Her attendance records for the year 1999 reflect that she actually took 132 sick days, 21 vacation days and 5 personal days, again preceding the change in policy.  Blauvelt was off for almost the entire year of 2002 with pay.  Blauvelt did not take any time that went unpaid for her first or second pregnancy. (Exhibit "K," Blauvelt Deposition, page 47).

Lochren took 86 sick days, 27 vacation days and 4.5 personal leave days in 1997, also exhausting virtually all of her accruals prior to the policy change.  (Exhibit "W," Lochren Time Sheets).

Although plaintiffs claim that the policy change discriminates against female officers because they are now required to exhaust accruals, four of the six plaintiffs exhausted virtually all their accruals **prior** to the change in policy.

Plaintiffs claim that use of extensive sick time could be considered when applying for a transfer. Plaintiffs, however, were unable to identify any positions that they did not receive due to the use of sick time. Plaintiffs, further, had no knowledge of any other officers that were denied a position due to the use of sick time. Most of the plaintiffs testified that they did not even apply for a promotion or transfer.

Mennella applied for a transfer to Narcotics in November of 2000 and did not get that position. (Exhibit "M," Mennella Deposition, page 17). This request was prior to her use of sick time for maternity leave.

While Mac Dermott felt that her transfer request to Narcotics was affected by the amount of sick time used, MacDermott also stated that her ability to be promoted has not been affected by the time that she took off due to maternity leave or pregnancies. MacDermott took a maternity leave of absence using accruals in 1997, **prior** to the change in policy. (MacDermott Deposition, page 45). MacDermott's transfer request to Narcotics was prior to the change in policy. (See, Exhibit "X," Application, dated 1999).

 (Exhibit "I," MacDermott Deposition, page 31). Accordingly, the change in policy in the year 2000 could not possible have affected MacDermott's decision to use all of her sick time in 1997. MacDermott also received several transfers made at her request. (MacDermott Deposition, page 28-30).

Riera and O'Brien have never applied for a promotion or a transfer (Exhibit "L," Riera Deposition, page 23; Exhibit "J," O'Brien Deposition, page 36-37). Blauvelt was unable to state that she did not receive the transfer to Applicant Investigations was due to her maternity leave. (Exhibit "K," Blauvelt Deposition, page 21). Blauvelt also did not apply for any other promotions or transfers. (Exhibit "K," Blauvelt Deposition, page 21).

Lochren stated that her ability to be promoted was not affected by the time she took off due to pregnancy and childbirth. (Exhibit "G," Lochren Deposition, page 54). Lochren stated that her ability to be transferred was not affected by the time she took off due to pregnancy and childbirth because she did not take any promotional exams. (Exhibit "G," Lochren Deposition, page 55).

18

"In order to establish a prima facie case for failure to promote, the plaintiff must allege that: 1) she is a member of a protected class; 2) her job performance was satisfactory; 3) she applied for and was denied promotion to a position for which she was qualified; and 4) the position remained open and the employer continued to seek applicants."

Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 (2d Cir. 2000).

> We read McDonnell Douglas and Burdine generally to require a plaintiff to allege that she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion. This general mandate ensures that, at the very least, the plaintiff employee alleges a particular adverse employment action, an instance of alleged discrimination, by the employer. Moreover, we believe if generally requesting a promotion in an annual review were sufficient to establish a prima facie case, employers would be unfairly burdened in their promotion efforts. Rather than simply considering individuals who have specifically applied for a promotion, an employer would additionally have to keep track of all employees who have generally expressed an interest in promotion and consider each of them for any opening for which they are qualified but did not specifically apply.

Brown v. Coach Stores, Inc., 163 F.3d 706, 710 (2d Cir. 1998).

Plaintiffs allege in conclusory terms that they could be denied a promotion, but several of them they never actually applied for promotions. Further, the plaintiffs exhausted all accruals before the change in policy. There can be no adverse employment action occurring with an inference of discrimination when the complained of employment action, here the loss of accruals, occurred prior to the alleged discrimination. See, for e.g, Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 95 (2d Cir.), cert. denied, 534 U.S. 951, 151 L. Ed. 2d 263, 122 S. Ct. 348 (2001).

Plaintiffs also claim that their longevity or seniority could be affected by taking unpaid leave. Again, the plaintiffs either took unpaid leave prior to the change in policy or did not take an unpaid leave at all. Four out of six of the plaintiffs exhausted accruals prior to the change in policy. Riera and Mennella did not take any leave that went unpaid. Further, according to the

Department, none of the plaintiffs' respective longevity or seniority dates have been affected by their leaves.  (See, Exhibit "Y," Affidavit of Maureen Looby, dated July 1, 2004.

Accordingly, the plaintiffs have not set forth any adverse employment actions occurring after the policy change.

### III.    QUALIFIED FOR THE POSITION

Finally the plaintiffs have not shown that they were qualified for the position of a full duty police officer.  Plaintiffs each claim that they requested a light duty assignment when learning of their respective pregnancies.  (See, Exhibit "A," Second Amended Complaint, ¶¶74, 91, 102, 122, 127 and 133).  Accordingly, by requesting a light duty or modified assignment, plaintiffs were not qualified to perform the full duties of a police officer.

### B.    DISPARATE IMPACT

Plaintiffs allege that they are disparately impacted by the change in policy.  The facts of this case are not appropriate for a disparate impact claim.

A disparate impact claim was soundly rejected in Dimino v. New York City Transit Authority:

> It has been repeatedly affirmed that the PDA does not require the creation of special programs for pregnant women; nor does it mandate any special treatment. See, e.g., Urbano v. Continental Airlines, Inc., 138 F.3d 204, 206 (5th Cir. 1998); Lang v. Star Herald, 107 F.3d 1308, 1313 (8th Cir. 1997); Piraino v. International Orientation Resources, Inc., 84 F.3d 270, 274 (7th Cir. 1996).  To the contrary, the statute specifically requires that pregnant women be treated the same as all other employees with similar disabilities. See 42 U.S.C. § 2000e(k). Here, Dimino's disparate impact claim is based on the premise that the facially neutral policy of not providing restricted duty to any medically limited police officer has a disparate impact on pregnant women. The only remedy for such a problem would be either the creation of a restricted duty assignment for all employees or for pregnant women. Both solutions would seem to violate the underlying assumption of equality over favoritism or allowance. While disparate impact analysis might be appropriate for a more narrowly tailored policy -- for instance, one that penalized internal illness more than external injury -- here the broad policy of not allowing medically based restricted duty does not invite disparate impact analysis.

64 F. Supp. 2d 136, 157-158 (E.D.N.Y. 1999).

In the instant case, directly on point with <u>Dimino</u>, the plaintiffs allege that females are impacted disparately then males because of a policy that does not allow light duty for any officer, male or female, with an off the job illness, condition or injury.

In viewing the chart dated May 2000 of officers on light duty status (sick or medical reasons) there are 30 officers on the list and only 9 females on the list for maternity. (See, Exhibit "Z," May 8, 2000 chart).   There is no disparate impact when the number of females is so low as compared to the number of males affected by the policy change in April of 2000.

In <u>Pollis v. New School</u>, the Second Circuit rejected plaintiff's statistical evidence because the sample was too small.

> "A statistical showing of discrimination rests on the inherent improbability that the institution's decisions would conform to the observed pattern unless intentional discrimination was present. The smaller the sample, the greater the likelihood that an observed pattern is attributable to other factors and accordingly the less persuasive the inference of discrimination to be drawn from it. Thus, several courts have ruled, as a matter of law, that discrimination may not be proved by statistics involving so small a pool. See <u>Mayor of Philadelphia v. Educational Equal. League</u>, 415 U.S. 605, 621, 94 S. Ct. 1323, 1333, 39 L. Ed. 2d 630 (1974) (statistical evidence regarding 13-member panel insufficient, based on small sample size, to support inference of racial discrimination); <u>Haskell v. Kaman Corp.</u>, 743 F.2d 113, 121 (2d Cir. 1984) (10 terminations over 11-year period insufficient sample size to support inference of age discrimination); <u>Coble v. Hot Springs Sch. Dist. No. 6</u>, 682 F.2d 721, 733-34 (8th Cir. 1982) (15 decisions over 8 years insufficient sample size to support inference of gender discrimination).  In addition to the small size of the group to which Pollis seeks comparison, each of the male members of the group differs so substantially from Pollis that no meaningful inference may be drawn from the statistics.

<u>Pollis v. New Sch. for Soc. Research</u>, 132 F. 2d 115, 121-122(2d Cir. 1997).

Here, we have six females that claim to be affected, although as discussed <u>infra</u>, plaintiffs are unable to establish any adverse employment action as a result of the policy change. In addition, as seen by the chart of officers, officers were on light duty due to serious illnesses

such as cancer.   Accordingly, the group differs so significantly that any statistics presented by

the plaintiffs are meaningless.

Although the plaintiffs have not set forth a prima facie case, the Department has

presented a legitimate reason for the change in policy.

The policy was adopted in response to a "growing number of people not fit for work."

(Exhibit "N"  Robilotto Deposition, page 181).  Robilotto further explained:

> Q.    When you say you had a growing issue, were there more people on this 301
> limited duty status—was that number growing prior to these meetings beginning?
> A.     In a sense that the yearly totals and the yearly averages were increasing, the
> answer is yes.
> Q.     Do you have a rough sense of how much these yearly averages or yearly totals
> were increasing?
> A.     Probably 10 to 15 percent.

(Exhibit "N" Robilotto Deposition, page 181).

> Q.     The reasons you mentioned for the change in policy were concerns about officers
> in light duty for long periods of time?
> A.     Yes.
> Q.     Was budget a concern, overtime?
> A.     Yes.
> Q.     Were there any other concerns that prompted the change in policy?
> A.     The Department has a finite number of personnel.  And once you start to
> approach 10 percent of that number, not available to perform the function that they were hired
> for, it's a problem.  That was the main reason.

(Exhibit "N"  Robilotto Deposition, pages 205-206).

According to the May 8, 2000 chart, there were 111 officers on light duty status and 83

officers on extended leaves of absence for the month of April 2000 for a total of 194 officers not

fit for full duty.  As Chief Robilotto testified, it was a concern of the Department when "you

start to approach 10 percent of that number, not available to perform the function that they were

hired for, it's a problem."  (Exhibit "N" Robilotto Deposition, pages 205-206).  Accordingly,

there were 194 officers not able to perform the function for which they were hired.

## POINT II

## PLAINTIFFS FAILED TO ESTABLISH
## A PRIMA FACIE CASE OF
## PDA DISCRIMINATION.

Plaintiffs claim discrimination under the Pregnancy Discrimination Act.  Plaintiffs,

however, have not been treated differently due to their pregnancies.

The Pregnancy Discrimination Act ("PDA") amended Title VII by providing that the definition because of sex includes discrimination based on pregnancy, child birth or related medical conditions. See, 42 U.S.C §2000e(k).  In Spivey v. Beverly Enterprises, Inc., 196 F. 3d 1309, 1312 (11th Cir. 1999) the Court rejected the plaintiff's PDA claim holding that the PDA does not require that employers give preferential treatment to pregnant employees.  The Court continued that an employer does not violate the PDA when it offers modified duty solely to employees who are injured on the job and not to employees who suffer from a non-occupational injury.  Id. at 1313.  Accordingly, the plaintiffs have not shown any discrimination under the PDA.  Title VII requires employers to treat employees who are members of protected classes the same as other similarly situated employees, but it does not create substantive rights to preferential treatment. 42 U.S.C. § 2000e-2(j) (1994). Thus, as the prima facie elements enumerated above demonstrate, [plaintiff] must have evidence that she was treated differently than similarly situated employees. In fact, the PDA specifically states that women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work. 42 U.S.C. § 2000e(k) (1994). See also Carney v. Martin Luther Home. Inc., 824 F.2d 643, 646 (8th Cir. 1987)(Congress sought to limit the burden on employers by making clear that the amendment was intended only to prevent the exclusion of pregnancy coverage, not to require that employers who had no disability or medical benefits at all provide them to pregnant women). As the Seventh Circuit candidly stated, The [PDA] does not require that employers make accommodations for their pregnant workers; employers can treat pregnant women as badly as they treat similarly affected but nonpregnant employees. Geier v. Medtronic, Inc., 99 F.3d 238, 242 (7th Cir. 1996) (quoting Troupe v. May Dep't Stores Co., 20 F.3d 734, 738 (7th Cir. 1994)). The plaintiff's burden of establishing a prima facie case serves, in part, to assure that the plaintiff has some competent proof that she was treated differently than similarly situated employees.

Horton v. Am. Railcar Indus., 214 F.Supp. 2d 921, 931-932 ( Dist.Ct. Ark. 2002)

The PDA does not require an employer to provide any preferential treatment to pregnant

woman.  Accordingly, the plaintiffs failed to establish a violation of the PDA.

## POINT III

### THE COURT LACKS JURISDICTION
### OVER ISSUES NOT RAISED
### BEFORE THE EEOC.

The Court lacks jurisdiction over issues not raised by the plaintiffs before the EEOC,

specifically, the disparate treatment claim. These claims were not raised before the EEOC.

> Prior to bringing discrimination claims under Title VII or the Rehabilitation Act, a
> plaintiff must exhaust available administrative remedies by filing a charge of
> discrimination with the EEOC.

See Holtz v. Rockefeller & Co., 258 F.3d 62, 83 (2d Cir. 2001).

> A federal court can also hear claims that are "reasonably related" to a complaint   brought
> before the EEOC.  A claim is "reasonably related" to the charge in an EEOC complaint if
> the claim "would fall within the scope of the EEOC investigation which can reasonably
> be expected to grow out of the charge of discrimination."

Butts v. City of New York Dep't of Hous. Pres. and Dev., 990 F.2d 1397, 1402 (2d Cir. 1993)).

As far as a disparate treatment claim, the EEOC specifically only addresses claims of

disparate impact.  (See, Exhibit "AA," EEOC determination).

## POINT IV

### PLAINTIFFS STATE CLAIMS MUST BE
### DISMISSED FOR FAILURE TO
### SERVE A NOTICE OF CLAIM.

Plaintiffs Lochren, O'Brien, MacDermott and Mennella completely failed to serve a

notice of claim and Blauvelt filed a late notice of claim. The service of the notice of claim by

Riera is not alleged in the complaint as a condition precedent to suit against the County.

The Notice of Claim requirement has been held to apply in the employment

discrimination context.  See, for e.g., Mills v. County of Monroe, 59 N.Y.2d 307, 464 N.Y.S.2d

709, 451 N.E.2d 456 (1983) ; Pustilnik v. Hynes, 2000 U.S. Dist. LEXIS 8718, 2000 WL 914629

*7 (E.D.N.Y. June 27, 2000)." Keating v. Gaffney, 182 F. Supp. 2d 278, 290 (E.D.N.Y. 2001).

24

Further, a Notice of Claim is required to be served because "N.Y. County Law §52 is a much broader statute than General Municipal Law §50-e and is the statute that applies to the claims brought against the County." Id. at 291.  Blauvelt served a purported notice of claim dated March 22, 2002, however her cause of action accrued on December 12, 2001, more than 90 days prior.  (See, Exhibit "A," Second Amended Complaint, ¶127, 128).  Under General Municipal Law §50(e), service of a notice of claim within ninety (90) days from the accrual of a cause of action founded on tort is a condition precedent to a lawsuit against the County or its employees. Hibbert v. Suffolk County Department of Probation, 267 A.D.2d 205, 699 N.Y.S.2d 466 (2d Dept. 1999); Proper service of the notice of claim must be alleged in the complaint as a condition precedent to any cause of action against the defendants.  Pretino v. Wolbern, 84 A.D. 2d 830,831, 444 N.Y.S.2d 190 (2d Dept. 1981).  Accrual occurs "when all elements of the tort can be truthfully alleged in a complaint." Snyder v. Town Insulation, Inc., 81 N.Y.2d 429, 599 N.Y.S.2d 515 (Ct. App. 1993) See also, LaBello v. Albany Medical Center Hosp., 85 N.Y.2d 701,706, 628 N.Y.S.2d 40, 651 N.E.2d 908(Ct. App.1995).  Accordingly, Lochren, O'Brien, MacDermott and Mennella's state claims must be dismissed for failure to serve any notice of claim; Blauvelt's state claims must be dismissed for not serving a timely notice of claim; and Riera's state claims must be dismissed for failure to allege the service of the notice of claim in the complaint as a condition precedent.

Dated: Hauppauge, New York
     6 July 2004

Respectfully submitted
CHRISTINE MALAFI
Suffolk County Attorney

BY

Diane Leonardo Beckmann/3276
Assistant County Attorney

TO:    David Fish (by hand)

## AFFIDAVIT OF SERVICE BY HAND DELIVERY

STATE OF NEW YORK)
                    ss.:
COUNTY OF SUFFOLK)

       Denis Tureski, being duly sworn deposes and says: deponent is over the age of 18

years, not a party to this action, and is associated with the Suffolk County Attorney's Office.

That on the 6th day of July 2004, deponent served the within MEMORANDUM OF LAW IN

SUPPORT OF SUMMARY JUDGMENT, NOTICE OF MOTION,DECLARATION AND

STATEMENT PURSUANT TO LOCAL RULE 56.1 by hand and delivering a true copy thereof

to:


David M. Fish
Rosen, Leff
105 Cathedral Avenue
Hempstead, NY   11550

                               Denis Tureski


  Sworn to before me this
  7TH day of July 2004

  Notary Public

JOANNE MALAFI
Notary Public, State of New York
No. 01MA6008368
Qualified in Suffolk County
Term Expires June 8, 20_6